**EQUITABLE LIFE ASSUR SOC. OF THE UNITED STATES v. STEWART et al.**

**In re RODDEY.**

District Court, W. D. South Carolina.
Aug. 26, 1935.

Thomas, Lumpkin & Cain, of Columbia, S. C., for Equitable Life Assurance Soc.

Belser & Belser, of Columbia, S. C., for Stewart, trustee.

W. M. Dunlap, of Rock Hill, S. C., and A. C. Todd, of Greenwood, S. C., for bankrupt, W. J. Roddey, Sr.

GLENN, District Judge.

This proceeding was instituted by the Equitable Life Assurance Society of the United States, petitioner above named, hereinafter called the Equitable, upon a petition seeking instructions as to whether it should pay the renewal commissions accruing under its general agency contract with the bankrupt above named on business written prior to the bankruptcy, to the said bankrupt, or to his trustee in bankruptcy, or to the subagents, and also seeking instructions as to whether it should pay the salary of $10,000 a year accruing to the said bankrupt as commander of the Equitable Veterans' Legion to the said bankrupt or to his trustee in bankruptcy.

The respondent Roach S. Stewart, as trustee in bankruptcy, filed a return and cross-petition claiming that all of the said renewal commissions accruing in future on business already written prior to the bankruptcy should be paid to him for the benefit of the general creditors, and that the bankrupt's subagents should file their claims as general creditors, and demanding that the matter of the salary of the bankrupt as commander of the Equitable Veterans' Legion should be investigated by the court.

The bankrupt filed a return and reply to the pleadings of the other parties claiming that what he called his share of the renewal commissions should continue to be paid to him direct, notwithstanding the bankruptcy, and that the subagents should be paid their share of the commissions in full, and also claiming that the salary as commander of the Veterans' Legion represented compensation for future services and should be paid to him direct.

On the issues thus made I have held several hearings and have taken considerable testimony, and after carefully considering the same, and the arguments of counsel thereon, have reached the findings and conclusions hereinafter stated.

There was some discussion as to the right and propriety of the court hearing this matter initially, but undoubtedly the court of bankruptcy has large discretion as to the way in which it will conduct bankruptcy proceedings. Here it is evident that it is much better to decide the questions involved in this proceeding and instruct the referee as to how to proceed, rather than to let the referee go forward with many hearings which would be of little avail without the decision of the court on the legal questions involved.

### Findings as to the Facts.

The bankrupt above named, or the partnership of which he was a member, has been for many years general agent for the state of South Carolina and portions of North Carolina for the Equitable. The major contract under which this business has been carried on was dated on the 3d day of February, 1913, and was between the Equitable and W. J. Roddey & Co., a partnership at that time composed of William J. Roddey, Joseph H. Miller, and James P. Quarles. Subsequently about 1923 James P. Quarles withdrew from the partnership, and in August, 1929, Joseph H. Miller died. Upon the retirement of James P. Quarles the agency was continued in the name of W. J. Roddey & Co., of which W. J. Roddey and J. H. Miller were the partners, and upon the death of J. H. Miller the general agency contract was continued both as to the company and as to all subagents in the name of Wm. J. Roddey, the above-named bankrupt, alone.

Under the above-mentioned contract and the amendment thereto dated February 6, 1933, the general agent was entitled to renewal commissions generally in the amount of 7½ per cent. from the second to the tenth years, and in the amount of 5 per cent. from the eleventh to the fifteenth years of insurance. The contract provided that such renewal commissions should continue to be paid to the second party, his executors or administrators, for the term of the years above mentioned, and that commissions should accrue only as premiums are paid in cash to the Equitable. The contract also provided that the Equitable should have the right to deduct from the renewal commissions thereunder provided 1 per cent. of the renewal premiums paid when the second party was not in its direct service as a general agent, and also provided that the Equitable would allow the general agent a fee of 1 per cent. for assistance in the collection of renewal premiums for any year after the tenth year. (Under an amendment dated June 5, 1922, the company agreed under certain conditions to waive its right to make this collection charge.) The contract further provided that the general agent should have the right to appoint subordinates subject to the rules present and future of the Equitable, but that such subordinates should have no claim against the company, although the company was empowered to carry out for the account of the general agent, if it desired to do so, any and all agreements made with such subagents. The contract further provided that the company might offset against any claim for compensation thereunder any debts due or to become due from the general agent to the company, and that any and all agency balances and accounts due were transferred and assigned as collateral security for the payment of any such indebtedness. The contract contained many other provisions regulating the relations between the parties, which, however, we need not now discuss.

Under this contract the bankrupt (or the partnership of which he was a member) carried on an extensive general agency business down to the early part of 1933. The total first year commissions earned under this contract between 1922 to 1934, inclusive, amounted to $1,170,373.66, and the total renewal commissions to $1,219,087.96. During this period the bankrupt, or his partnership, entered into a great many contracts with subagents. All of these contracts were between the bankrupt, or his partnership, and such subagents, and the Equitable was not a party to any of them. These contracts were all different forms, but generally provided for the payment of certain renewal commissions to such subagents up to the tenth year, the renewal commissions to be paid only when the premiums were paid in cash to the general agent or to the Equitable. The commissions were always paid by the Equitable to the bankrupt, or his partnership, upon statements prepared by the cashier of the agency, and which showed the amount of com-

missions due to such subagents as well as to the general agents. The general agent always deposited the money received from such commission accounts in his own name, but habitually furnished a statement to each subagent showing a credit to such subagent for his commission. The Equitable habitually settled with the general agent every fifteen days, but the general agent generally had running accounts with each subagent and sent balance sheets to such subagents monthly. Down to the spring of 1933 the Equitable never paid any commissions direct to any of the subagents. In the spring of 1933, however, the bankrupt by letter of April 24, 1933, requested the Equitable to pay direct to the subagents the commissions becoming due from the general agent to such subagents with the understanding that the company undertook "no responsibility toward such subagents * * * and reserves to itself the right to cease at any time to make any further such payments." The Equitable acceded to this request, and by letter dated June 5, 1933, addressed to and agreed to by all subagents, agreed to pay such subagents the commissions accruing under their contracts with the bankrupt, or his partnership, with the understanding, however, that the Equitable "does not assume any responsibility" to the subagents for the payment of the commissions. Previous to this arrangement by letter of March 20, 1933, the bankrupt no longer had the right to appoint subagents, and the Equitable had entered into contracts directly in its own name with the bankrupt's former subagents for the writing of future insurance business.

After the signature of the above-mentioned letter of June 5, 1933, the Equitable has been paying commissions direct to the bankrupt's former subagents.

About October, 1934, the receivers of the Central Union Bank, of which the bankrupt had at one time been president, and to which he was largely indebted, commenced supplementary proceedings, on a judgment already obtained against the bankrupt and the Equitable, to sequestrate these renewal commissions, and secured an injunction against the Equitable making any further payments on account of these commissions to the bankrupt or any other person. (The said Central Union Bank had been closed in March, 1933, under the President's proclamation and had never reopened.) Soon thereafter the bankrupt filed his voluntary petition in bankruptcy.

The record further shows that about May, 1933, the Equitable created the position of commander of the Equitable Veterans' Legion, and under a resolution awarded the said position to the said bankrupt at a salary of $10,000 a year. The said resolution further provided that the amount and duration of the compensation should be subject to change from time to time by the Equitable, dependent upon the value of the services to be rendered.

The record further shows that from time to time both the members of the partnership holding the general agency and also the subagents have borrowed money on the security of their renewal commissions, and have assigned their renewal commissions as security for such loan. Also the Equitable from time to time furnished both to the bankrupt and to his former partner J. P. Quarles estimates of the value of their renewal commissions for assignment and security purposes. The estate of J. H. Miller, one of whose executors is now the general manager for the Equitable, has apparently invested some $30,000 in the subagents' renewal commissions which have been assigned as security for such loans.

All the foregoing facts are largely undisputed, and indeed are generally matters of written and documentary evidence and undisputed practice. The solution of the legal questions presented depends upon the proper interpretation of the undisputed facts.

### Personnel Having Interest in the Roddey Agency and Contract with the Equitable.

To briefly state the status of the parties, the above-named bankrupt, Wm. J. Roddey, has been in the employ of the Equitable Life Assurance Society of the United States as agent, or general agent, since the year 1889. In the latter part of the year 1906, he entered into a general agency contract with the above-named society, but most of the rights existing under that contract have long since expired with the possible exception of Mr. Roddey's rights as to collection charge and/or collection allowance provided for in that contract. Certainly no subagents have any existing rights thereunder.

In 1913 Mr. Roddey entered into an entirely new and different contract with the above-named society, and this contract together with a number of amendments constitutes the real and final agreement be-

tween the parties and upon which this litigation is based. In this contract of 1913 Mr. Roddey had two partners—Mr. J. P. Quarles and Mr. J. H. Miller. Mr. Wm. J. Roddey owned a one-half interest in the general agency, Mr. J. P. Quarles one-fourth, and Mr. J. H. Miller one-fourth. Thereafter, in the year 1924, Mr. Quarles retired from the partnership and the general agency contract was continued in the name of W. J. Roddey & Co., with Mr. Roddey owning a five-eighths interest and Mr. J. H. Miller a three-eighths interest in the partnership. In 1929 Mr. Miller died, and under the terms of the contract his future interest therein expired, but his estate was still entitled to collect the proportionate renewals due to him by virtue of the contract and partnership agreement. Of course, Mr. Quarles since his retirement from the firm in 1924 has been receiving, and is still receiving, his proportionate part of renewal commissions earned up to the year 1924 when he retired from the firm.

It might be well to state that the amendments entered into from time to time to the 1913 contract do not affect the issues here except in so far as the amendments apply to the partners changing interests therein.

After 1929 Mr. Roddey enjoyed the full general agency under his original contract and continues in the same status up to the present time, although for a short period Mr. John Roddey and Mr. E. R. Jeter were made partners in the firm, but they later retired and reassigned all their rights to Mr. Roddey.

Numerous so-called subagents were appointed from time to time by Mr. Roddey or by his general agency, and at the time of this proceeding there were sixty-seven such subagents on the books of the general agency.

After argument of the case in open court, counsel for the various parties have furnished very full and complete briefs of the law as covering the various claims asserted herein on behalf of the several parties. The court has given very careful and thoughtful consideration not only to the evidence as produced on the trial of the cause, but to the briefs of counsel fully setting forth the facts and law as viewed by the various attorneys in the case.

### Conclusions of Law.

### Status of Subagents.

The petitioner, while coming into the court very much as a stakeholder and asking for instructions, nevertheless has asserted affirmatively that there is due all subagents the 5 per cent. renewal commissions provided for in the subagents' contracts to be paid to the subagents over a period of years. In short, while the petitioner is primarily concerned with the instructions of the court, it is also before the court on behalf of its subagents, and has in testimony and argument resisted the contention that the subagents were nothing but common creditors of Roddey, individually, and of the Roddey Agency. Many provisions of the contracts might be cited and discussed to support the conclusion of the court that this contention of petitioner must be sustained, but I see no reason to go into this matter at length, in view of what we have heretofore stated in this opinion. The important matter is the long course of dealing between all of the parties over a long period of years. The court thinks that the subagents now have, under all of the contracts and letters, as they have been acted upon and construed between the parties themselves, a right to look to the Equitable itself for the payment of their share in the accruing renewals. Through the practice of keeping the books in the office of the agent where the company had on duty its cashier, who was its agent and in no way the agent of the Roddey Agency, and where credit was immediately given to the subagent upon the receipt of a renewal premium for his share in that premium, the company has admitted over this long period of years its liability to the subagent for such renewals.

[1.] A court of bankruptcy should not go out of its way to seek out a fund to administer when the evidence shows that the administration of that fund can be and is being had independently of the bankruptcy court. Regardless of all the evidence to the contrary, the general agent at all times considered himself a de facto trustee for the subagents as to the funds which came into his hands and which were then payable to the subagents as their share in the commissions. The practice of the bookkeeping department supports this theory. The general agent, a man of integrity and fair dealing, testified that he never had any other thought except that this money belonged to the subagents directly and that he was nothing more than a trustee for them as to this money. Trust relationship may arise by action of parties over a long period of years. Widely separated statements in numerous documents and letters

have little value as compared with the conduct of the parties themselves over a long period of years. The controlling evidence is found in the way the money was actually handled over a long period of years.

■ The bankrupt and his general agency were, in the opinion of this court, trustees of the fund belonging to the subagents and under well-accepted principles of bankruptcy law funds or rights of third parties as to which the bankrupt is a trustee (however that trust be created) do not pass to the trustee in bankruptcy. The fact that the Equitable has since the 5th day of June, 1933, been paying the subagents directly shows that it is possible to administer this fund outside of the court of bankruptcy. It cannot be said that that which has been done successfully and justly in one way has to be done in another way.

The attorneys for the trustee contend most earnestly that the result of the indicated decision will be to make the subagents of the Equitable preferred creditors of the bankrupt without warrant of law. The answer to the argument is, as above stated, that we considered that the general agent was under all the evidence merely a trustee for the subagents.

[3] In determining this matter we are not unaware of the equitable consideration which a court must have as to whether or not third parties have been misled into believing that certain assets are available for the satisfaction of credit extended to a bankrupt. There is no showing that any credit was ever extended to the bankrupt by anyone relying upon the bankrupt's right to the share of the commissions which are allocated to the subagents. The reasonable view is rather to the contrary. It is the view of this court that every reasonable business man, on the outside and uninformed as to the exact terms of the contracts between the Equitable and Roddey and then between Roddey and the subagents, might extend credit to Roddey upon his share in the renewals; but it is not shown that any reasonable business man would have ever concluded that Mr. Roddey had legal title to the share in the renewals which passed to the subagents. It is the opinion of this court that both layman and lawyer, uninformed as to the exact wording of the contracts, would reasonably conclude that the subagents' commissions belonged to them. If the value of the renewals at any time constituted a basis of credit extended to Mr. Roddey individually, the court is satisfied that it was Mr. Roddey's individual right to the renewals and not the rights of the subagents which constituted the basis of credit extended.

The court is, therefore, of opinion that the renewal commissions of the subagents, unless assigned as hereinafter referred to, are due and payable by the Equitable Life Assurance Society of the United States to such subagents.

■ With reference to the salary paid to Mr. Roddey as commander of the Equitable Veterans' Legion, I am convinced that this does not pass to the trustee, not only including that which has accrued since the adjudication in bankruptcy, but that which may be payable hereafter.

It is not closely related to past services prior to bankruptcy, but is closely related to his future services. It could not be said in any way to be an asset which under the law would pass to the trustee. It is not only closely related to services since adjudication and future services, but its legal existence is dependent upon many contingencies not necessary to be mentioned, but abundantly disclosed by the testimony. I therefore hold that it is not of that definite and certain nature necessary to constitute property which would pass to the trustee in bankruptcy. Furthermore, the contention of the trustee as made by his pleadings in respect to this salary has not been seriously argued and is not one of his major contentions. I have no hesitancy in deciding that it does not pass to the trustee, and it is so ordered.

■ Now, with reference to excess commissions provided for in the W. J. Roddey & Co. contracts over and above the commissions due subagents, if any, the bankrupt, Wm. J. Roddey, contends that all of this excess should be payable to him and not to the trustee in bankruptcy, and bases his contentions on two propositions:

(1) In that by the provisions of the contract between the society and himself commissions are expressly made nonassignable and therefore do not pass to the trustee. And

(2) The other proposition is that these excess commissions over and above the amounts due the subagents which are admittedly rights growing out of the contracts in evidence are not property passing to the trustee because they are not assign-

able. The bankrupt claims that they are not assignable because they really are compensation for 'future services and are coupled with the liabilities imposed upon the bankrupt (general agent) under the contract and are involved in special relation or personal trust and confidence.

This brings us to the real vital legal question in the controversy. The underlying principles are well settled. The difficulty comes in determining which of the principles shall control here. Undoubtedly the actual accrual of the renewal premiums and their actual payment are events which will have to happen in the future. Therefore, the realization upon the right to these renewals will necessarily be in the future. On the other hand, the legal existence of this right clearly came into being long before the bankrupt filed his petition in bankruptcy. There are two considerations which must be had in mind. First, it is well settled that a bankrupt when once discharged should not be hampered in the enjoyment of future earnings. The courts have repeatedly said that one of the purposes of bankruptcy is to give an embarrassed debtor a new chance in life; to wipe out the debts provable in bankruptcy and to allow him to apply his future earnings to future liabilities without embarrassment from his old creditors. On the other hand, no debtor should be allowed by reason of an advantageous contract with a third party to defeat the rights of his creditors by collecting in the future (after bankruptcy) the fruits of services rendered prior to bankruptcy. Particularly is this true where credit has been extended in reliance upon the earnings which the bankrupt is reputed and known to have been making under the terms of that particular contract. Ordinarily, of course, future earnings do not pass to the trustee in bankruptcy. But here we have a case where the future receipts are practically the automatic result of past services rendered to the Equitable. Certainly this is true as to the overriding or excess marginal commissions. The bankrupt and the Equitable seem to have recognized the distinction between compensation for future services and the automatic compensation which would flow to the general agent, Roddey, by reason of the continued payment of the premiums on policies written before the date of bankruptcy. The fact that the parties themselves have allocated 1 per cent. as a "collection charge" indicates that they themselves thought that

the 1 per cent. was the proper amount to pay for the future services to be rendered. The 1 per cent. is contingent upon the general agent continuing to render this particular class of service. The marginal commissions, however, pass almost automatically to the general agent without regard to any future services rendered by him. The distinction is clearly seen when we notice that the 1 per cent. would of course stop upon the death of the general agent, whereas, the marginal commissions would continue to be paid to the estate of the general agent, if he should die before they had all been received. How can it be said that marginal commissions which would be payable to a man's estate after his death are in reality and in substance related to and dependent upon services which he is to perform? It seems to us that the trouble to which the company and the general agent have gone in distinguishing between the 1 per cent. collection charge and the straight marginal commissions is the strongest evidence that the 1 per cent. is related to future services; and, therefore, should not pass to the trustee;. while, on the other hand, the marginal commissions are related to services rendered before bankruptcy and should, therefore, pass to the trustee. It is a fit case, we think, for the application of the principle of construction summed up in the maxim, "Inclusio unius exclusio alterius."

█ We now consider especially the sections of the contracts which deal with the collection allowance of 1 per cent. In considering this feature of the case we must consider both the so-called *collection allowance* of 1 per cent. as provided for in section 5 of the contracts, and the 1 per cent. *collection charge* provided for in paragraph 4 of the contracts. Section 5 as referred to above reads as follows: "5. Second party agrees to render the Society every assistance possible to secure the retention of its business upon its books and in the collection of renewal premiums; the Society agrees to pay or allow second party, while in its direct service as a general agent, a fee of one per cent for the collection of renewal premiums received for any year and after the tenth year of assurance on business secured hereunder."

It will be observed that this 1 per cent. commission applies after the tenth year of assurance on any business secured under the contract. It is plain that it is no part of the marginal or overriding commis-

sions. The testimony indicates that, relatively speaking, it will amount to very little. I am satisfied that it is purely compensation for future services in respect to a special class of business, premiums paid after ten years. I, therefore, hold that this 1 per cent. does not pass to the trustee.

Paragraph 4 of the general agency contract in question provides as follows: "4. The Society shall have the right to deduct from renewal commissions hereunder one per cent of renewal premiums paid when second party is not in its direct service as a general agent, unless such service was terminated by reason of the death, or, in the judgment of the Society, the physical or mental disability of the second party."

█ The 1 per cent. referred to in this provision is called the "collection charge." It will be observed that if the bankrupt should cease to be general agent of the society, the society would then deduct from the renewal commissions accruing under the contract 1 per cent., leaving to the general agent the excess over that amount to be paid to him as renewal or marginal commissions as collected in the future. The fact that the contract contains this provision indicates very clearly that only 1 per cent. of the so-called renewals or marginal commissions can be considered compensation of the bankrupt for future services. It strongly indicates the extent to which the contention of the bankrupt should be applied. It seems clear that it provides the measure of the bankrupt's compensation for all services rendered by him as general agent under the contract since his adjudication and hereafter. This 1 per cent., known as "collection charge," comes out of the renewal or marginal commissions due the general agent. In view of the manifest intention of the parties, as gathered from the contract and the testimony, I am satisfied that the contention of the bankrupt should be sustained to the extent of 1 per cent., and I, therefore, hold that this percentage of the renewal or overriding commissions does not pass to the trustee. It will not be necessary to determine the amount of this 1 per cent. which has accrued since the adjudication in bankruptcy, or to appraise the amount which will accrue hereafter, because it will be paid to the bankrupt by the society in accordance with their contractual relations.

Decision of the controverted questions has to be made largely upon initial application of legal principles to the particular situation. Very few authorities deal with similar circumstances. The only case found by a number of astute and learned counsel with a similar situation is that of In re Wright (C. C. A.) 157 F. 544, 18 L. R. A. (N. S.) 193. While this is the opinion of just one Circuit Court of Appeals affirming one district judge, this particular court is of the same opinion and follows the Wright decision. In the Wright decision the right to renewals was definitely assignable without the consent of the company. In the instant case there is language indicating that the consent of the company is necessary to an assignment, but the court does not think that this distinction would so alter the legal situation as to prevent the decision in the Wright Case from applying here.

There are also many cases where it is stated that the requirement of consent of a third party to assignment of a contract is not sufficient to prevent the passage of a right under that contract to a trustee in bankruptcy. The fact that a contract may not be assignable, because of the highly personal nature of the contract, does not necessarily mean that the earnings under that contract may not be assigned. A contract involving a high degree of personal skill would naturally not be assignable, but this does not mean that the earnings under this contract might not be assigned as collateral for a loan or might not be levied upon to satisfy a judgment. We do not deem it necessary to go into this phase of the matter at great length, and attach at the end of this order a note of the cases which discuss these principles of law in a general way.

The court, therefore, holds with reference to the three items just hereinabove discussed:

(a) That the *collection allowance* mentioned and referred to above in paragraph 5 of the contract does not pass to the trustee, but remains as a contractual payment to be made by the society to Mr. Roddey.

(b) That the *collection charge* mentioned in paragraph 4 of the contract and hereinabove referred to is not property passing to the trustee in bankruptcy, but must since the date of the adjudication in bankruptcy be paid direct to Mr. Roddey because of and for the reasons hereinabove set forth.

194

(c) That the trustee in bankruptcy is entitled to collect from the Equitable Life Assurance Society of the United States the share of W. J. Roddey in the "excess commissions" provided for in the W. J. Roddey & 'Co. contract, dated February 3, 1913, over and above the commissions due subagents, and over and above the "collection allowance" and "collection charge" just dealt with in paragraphs (a) and (b).

Because of various provisions in the subagents' contracts as to volume of production, etc., on which renewal commissions are based, it will be necessary hereafter to take an order of reference directing the referee in bankruptcy to ascertain the exact amount to be paid from time to time to the trustee in bankruptcy. The court will also later entertain motion for an order whereby the trustee in bankruptcy may offer for sale these so-called "excess commissions" found to be due to the trustee as it may be possible to realize immediately on these excess commissions by a lump sum sale thereof.

It will be remembered from the testimony that the original general agency contract dated in 1907 was entered into with W. J. Roddey, the bankrupt. However, nothing appears to be due under this agreement except a small annual collection allowance, and, as hereinbefore determined, as this is for personal services to be rendered in the future, it does not pass to the trustee.

From the testimony herein it appears that J. Perrin Quarles has a contract dated January 1, 1910, with the society, but as to this the trustee in bankruptcy can claim nothing and the society is entitled to comply with the provisions of this contract, and to pay Mr. Quarles any amounts that may be due thereunder from time to time.

Under the contract dated February 3, 1913, and which is the main contract in evidence in this case, Wm. J. Roddey under the partnership agreement had one-half interest, J. H. Miller one-fourth interest. On February 1, 1924, J. P. Quarles retired from the partnership. As to this one-fourth interest the trustee in bankruptcy can make no claim, and the society should make direct settlement with and payment to Mr. Quarles.

Up to February 1, 1924, Mr. J. H. Miller, now deceased, had a one-fourth interest in the general agency contract. After the retirement of Mr. Quarles a new partnership agreement was entered into, whereby Mr. Miller had a three-eighths interest and Mr. Roddey a five-eighths interest. Mr. J. H. Miller died on July 28, 1929, and except for his right to renewal commissions his interest in the general agency ceased at the date of death. The trustee in bankruptcy can lay no claim to the partnership rights of Mr. Miller or to any renewal rights which he may have by virtue of his own production of business with the society, and consequently direct settlement may be made with the estate of J. H. Miller by the Equitable Life Assurance Society of the United States for any and all amounts due or to become due in the future.

From and after July 28, 1929, W. J. Roddey enjoyed all rights under the general agency contract except for a short period of time when E. R. Jeter and John Roddey were admitted to the partnership on the 25th day of February, 1932. However, this was ended and terminated on March 1, 1933, and Mr. Roddey's rights continued as an individual general agent under the contract.

As to the rights of J. P. Quarles, under individual contracts with the society and individual contracts made through the general agent, he is entitled to receive all amounts due by way of renewals, or otherwise, under these contracts and for these amounts the trustee can assert no claim.

Assignments: A number of subagents have assigned their commissions to the estate of J. H. Miller, and as to these assignments direct payment must be made by the society to the estate of J. H. Miller, for the reasons hereinbefore set forth. After such assignments are paid in full, as agreed upon with the subagents, the said subagents shall be entitled to receive payments direct from the society after settlement in full has been made with the estate of J. H. Miller.

With reference to assignments to W. J. Roddey and W. J. Roddey & Co. made by subagents who have either borrowed money or owe money to the said bankrupt, or as covering his interest in the partnership when the same existed, the trustee in bankruptcy is entitled to take hold and receive the returns on these assignments until the same are paid in full according to their provisions, and then after such payment is made in full the subagents shall be entitled to receive payment direct from the

society for any balance remaining due or to become due.

It appears from the evidence that there are certain cases where subagents have died and the amounts of renewals as provided for in their contracts are due and payable to their estates, or to guardians or trustees, and in some instances payable to an assignee. In all of these cases the society is entitled to and is hereby authorized and directed to make payment direct to the representative of such estates, or to such trustee, guardian, or assignee as the particular case may require.

As hereinbefore stated, the parties to the proceeding shall have the right to apply at the foot of this decree for such other and further orders as may be deemed necessary in the premises.

And it is so ordered.