**MUTUAL TRUST LIFE INSURANCE COMPANY, Plaintiff,**

v.

**George S. WEMYSS et al., Defendants.**

**Civ. No. 10–165.**

United States District Court,
D. Maine, S. D.

Feb. 27, 1970.

1222

John A. Mitchell, Portland, Me., for plaintiff.

Robert M. York, Old Orchard, Me., James R. Desmond, Robert C. Robinson, James R. Flaker, David N. Fisher, Jr., Harrison Richardson, Portland, Me., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is an action brought by Mutual Trust Life Insurance Company arising out of the defalcations and subsequent bankruptcy of a former general agent, George S. Wemyss. Jurisdiction is grounded in diversity of citizenship. The amended complaint is in three counts. The first count is an action in the nature of interpleader pursuant to the Federal Interpleader Act, 28 U.S.C. § 1335 (1964), to determine the rights of the parties with respect to the proceeds of a $10,000 life insurance policy of which Wemyss was the owner and named beneficiary at the date of his bankruptcy. The second count seeks a declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* (1964), as to the rights of the parties with respect to the renewal commissions due, and to become due,[1] to Wemyss under his employment contract with Mutual. In the third count Mutual demands judgment against Globe Indemnity Company in the amount of $16,459.-33 claimed to be owed under a fidelity bond issued by Globe insuring Mutual against the defalcations of Wemyss.

The relevant facts have been stipulated by the parties to be as follows:

Wemyss had been employed by Mutual as its general agent in Portland since

---

1. *But see*, n. 4, *infra.*

1946. Periodically his employment contracts were renewed, the most recent renewal being dated July 1, 1965. In late November 1967 Wemyss disclosed to Mutual that he had defrauded the company out of a substantial sum in advance premium payments. His employment was immediately terminated. On December 5, 1967 Wemyss filed a petition in bankruptcy and was adjudicated bankrupt in this Court. As of December 5, 1967 Wemyss' total defalcations were $18,306.93, but additionally Wemyss was indebted to Mutual for advances to his general agency and personal accounts in the total sum of $11,238.52. Wemyss also was obligated to Mutual for advances to an employee, Wynn Crawford, in the amount of $830.76. All of the monies advanced by Mutual to Wemyss were represented by notes which were executed within six years prior to the date of bankruptcy.

On the date of bankruptcy, Wemyss was the owner and beneficiary and had all the incidents of ownership of a $10,000 life insurance policy written by Mutual on the life of Lloyd F. MacDonald, a former employee of Wemyss. At that time the policy, which had been issued on June 8, 1967, had no cash surrender value. On February 3, 1968, within two months after Wemyss' bankruptcy, MacDonald died. As of May 1, 1969, the date of filing of the amended complaint in this Court, the amount due on this policy was $10,552.50, which amount has been paid into Court by Mutual.

Under the terms of Wemyss' employment contract, he, or his estate, was to be paid renewal commissions on all insurance policies written by him or his general agency as long as they remained in force. Mutual is presently withholding $9,382.86 renewal commissions earned to the date of trial, of which $176.09 was earned prior to the bankruptcy. The amount of any future renewal commissions to which Wemyss might be entitled is not presently ascertainable because his right to receive them is contingent upon the policies remaining in force and the premiums thereon being collected and paid as they become due. Nor have the parties been able to agree upon their present commuted value.[2]

On November 25, 1961, six years prior to his bankruptcy, Wemyss had executed an assignment of his right to all future renewal commissions under his employment contract in favor of First National Bank of Brunswick as collateral for loans by the Bank to Wemyss.[3] Mutual expressly consented to this assignment. As of the date of bankruptcy, Wemyss was indebted to the Bank in the total amount of $8,093.38.

Globe insured Mutual against losses by embezzlement, defalcation, or other dishonest or illegal actions of Wemyss during the period from November 1, 1964 through November 1, 1967. Globe's liability to Mutual under this policy is $16,459.33, for which Mutual has filed the proof of claim required by the policy. Lumbermen's Mutual Casualty Company similarly insured Mutual from November 1 through December 1, 1967. Wemyss' defalcations during this period totaled $1,945.60. Lumbermen's has wholly compensated Mutual for $945.60 of these losses, and Mutual has absorbed $1,000 of the losses under the deductible clause of the policy.

In addition to plaintiff Mutual, the parties presently before the Court, all named as defendants, are: Wemyss, Globe, Lumbermen's, Wemyss' Trustee in Bankruptcy, and Maine National Bank, the corporate successor to First National Bank of Brunswick.

At issue in this case are: (1) the rights of the various parties to the proceeds of the life insurance policy on

---

2. The parties have stipulated that if the Linton's Tables apply, the present value of Wemyss' right to future renewal commissions, discounted at 3%, would be either $18,235.36 (per Table B) or $25,786.22 (per Table A). But Mutual has refused to consent to a commutation.

3. There was no filing of any security agreement or financial statement with respect to Wemyss' debt to the Bank.

the life of Lloyd MacDonald; (2) the rights of the parties to the renewal commissions earned by Wemyss under his employment contract with Mutual; and (3) the amount of Globe's liability to Mutual under its fidelity bond. For the reasons which follow, the Court has concluded: (1) that Wemyss' Trustee in Bankruptcy is entitled to the life insurance proceeds as an asset of the bankrupt estate; (2) that Mutual is entitled to apply the renewal commissions presently held by it[4] in satisfaction of Wemyss' indebtedness to Mutual; and (3) that Globe is liable to Mutual under its fidelity bond in the stipulated amount of $16,459.33, without any credit for the amount of the renewal commissions presently to be applied by Mutual in satisfaction of Wemyss' indebtedness to it.

## I

### The Life Insurance Proceeds

It is stipulated that on December 5, 1967, the date of his bankruptcy, Wemyss was the owner, beneficiary, and had all the incidents of ownership of the $10,000 life insurance policy issued by Mutual on the life of Lloyd MacDonald, Wemyss' former employee; that at that time the policy had no cash surrender value; and that MacDonald died on February 3, 1968 while the bankruptcy proceeding was still pending. The Trustee claims that the proceeds of this policy passed to him as an asset of the bankrupt estate. Wemyss and the three insurance companies contend that the proceeds passed to Wemyss as after-acquired property.[5] All parties agree that their rights to the insurance proceeds must depend upon the proper interpretation and application of Section 70, sub. a(5) of the Bankruptcy Act, 11 U.S.C. § 110(a) (5) (1964), which provides in relevant part as follows:

The trustee of the estate of a bankrupt * * * upon his * * * appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon

4. Since the amount of any future renewal commissions which may become due to Wemyss under his employment contract is at best speculative, the Court will not in this proceeding resolve the conflicting claims of the parties with respect to any commissions on renewal premiums which may be collected by Mutual in the future. The Declaratory Judgment Act permits a federal court to declare the rights of the parties "in a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201 (1964). It does not empower the court to render an advisory opinion on a hypothetical controversy which may or may not arise concerning a fund which may or may not come into existence at some future date. *See* Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); Maryland Casualty Co. v. Pacific Coal & Iron Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); Maryland Casualty Co. v. Transportation Underwriters, 240 F.Supp. 192 (N.D.Ohio 1965); 6

Moore's Federal Practice ¶ 57.12 (2d Ed. 1965).

5. The Bank makes no claim to the insurance proceeds.

The insurance companies, of course, take the further position that they may reach the insurance proceeds in Wemyss' hands to satisfy the defalcation claim against him. In light of the Court's conclusion that the Trustee is entitled to the insurance proceeds, there is no occasion to pass upon the question raised by Wemyss' contention that Mutual's defalcation claim was for a debt which was discharged by his bankruptcy, despite the provisions of Section 17, sub. a(2) and (4) of the Bankruptcy Act, 11 U.S.C. § 35(a) (2) and (4) (1964). Similarly, it is not necessary to reach the questions of whether, if the defalcation claim was not dischargeable, Mutual would be entitled to recover the insurance proceeds in this proceeding, and if so, the extent to which Globe and Lumbermen's might be subrogated to Mutual's rights and share in its recovery.

and sold under judicial process against him, or otherwise seized, impounded, or sequestered: * * * *And provided further,* That when any bankrupt, who is a natural person, shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives, he may, within thirty days after the cash surrender value has been ascertained and stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own, and carry such policy free from the claims of the creditors participating in the distribution of his estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets; * * *.

■ It is not disputed that prior to his bankruptcy Wemyss could have transferred the insurance policy here involved and that it might have been levied upon and sold under judicial process against him. Nor was the policy exempt under Maine law. 24 M.R.S.A. § 426 (1964) (as amended 1967, repealed ch. 132 § 11 (1969), now 24–A M.R.S.A. § 2428 (1970)). It is thus clear, as the parties agree, that by virtue of Section 70, sub. a(5) Wemyss' interest in the policy vested in the Trustee as of the date of the filing of the petition in bankruptcy, unless the proviso to that section is applicable.[6]

With respect to the applicability of the proviso, certain principles are well established. The proviso in terms operates only when "any bankrupt, who is a natural person,[7] shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives." The Supreme Court has held that where the bankrupt is the owner of a life insurance policy on his own life, which has a cash surrender value payable to himself, his estate, or personal representatives, he is entitled to keep the policy by paying or securing to the trustee its cash surrender value determined as of the date of bankruptcy. Burlingham v. Crouse, 228 U.S. 459, 33 S.Ct. 564, 57 L.Ed. 920 (1913); Everett v. Judson, 228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927 (1913); Andrews v. Partridge, 228 U.S. 479, 33 S.Ct. 570, 57 L.Ed. 929 (1913). Similarly, if such a policy has no cash surrender value, it remains the property of the insured, and the trustee is not entitled thereto. Burlingham v. Crouse, *supra.* It is also settled that where the bankrupt is the beneficiary, but not the owner, of an insurance policy on the life of another, the trustee has no claim to the policy or to its cash surrender value, and if the insured dies subsequent to the filing of the petition, the proceeds of the policy become after-acquired property which belongs to the bankrupt, not the trustee. Klebanoff v. Mutual Life Insurance Company of New York, 362 F. 2d 975 (2d Cir. 1966); In re Hogan, 194 F. 846 (7th Cir. 1912). The few decided cases are in conflict, however, on the question posed by this case, *i. e.,* whether the proviso applies where the bankrupt is both the owner and the beneficiary of a life insurance policy issued on the life of another person.

6. If a policy in existence at the time of bankruptcy names the bankrupt as beneficiary without any reservation by the insured of the power to change such designation, the bankrupt has a vested though potential interest that vests in the trustee as an asset of the estate, subject, of course, to the conditions that the property is transferable or leviable and is not exempt. (footnote omitted) 4A Collier on Bankruptcy ¶ 70.23 [7] at 335 (14th Ed.1969) (hereinafter cited as Collier).

7. The phrase "who is a natural person" was added to the proviso in 1938 by the Chandler Act, June 22, 1938, ch. 575 § 1, 52 Stat. 879. Remington suggests that the 1938 amendment was merely declaratory of prior law. 3 Remington on Bankruptcy § 1245 at 107 (Rev.Ed.1957) (hereinafter cited as Remington). *See also* H.R.Rep.No.1409, 75th Cong., 1st Sess. (1937) at 34. Collier, however, expresses the view that the purpose of the amendment was to avoid an issue which had not previously been determined. 4A Collier ¶ 70.23 [3] at 316–317, n. 10.

Four courts have spoken on the present issue. Three of these courts have held that since a bankrupt who is the owner of a life insurance policy, whether on his own life or on the life of another, falls within the literal language of the proviso, the proviso applies even though the bankrupt is not the insured. Curtis v. Humphrey, 78 F.2d 73, 103 A.L.R. 236 (5th Cir.), cert. denied, 296 U.S. 605, 56 S.Ct. 121, 80 L.Ed. 429 (1935); In re Jacobsen, 24 F.Supp. 749 (D.N.J.1938); In re Clark, 169 F.Supp. 391 (W.D.Mich.1959).[8] The only other court which has dealt with this specific problem reached a contrary conclusion, holding that the proviso is applicable only to insurance policies issued upon the life of the bankrupt. In re Beachley, 19 F.Supp. 104 (D.Md.1937).[9] It is impossible to reconcile the result reached in *Curtis, Jacobsen* and *Clark* with that reached in *Beachley*, although it has been suggested that the latter case may possibly be distinguished because there was no blood or marital relationship between the bankrupt and the insured. *See* In re Jacobsen, *supra*, 24 F.Supp. at 750; Note, 39 Col.L.Rev. 507, 509 (1939); Note, 87 U. of Pa.L.Rev. 344 (1939).

Unquestionably, a literal reading of the language of the proviso to Section 70, sub. a(5) suggests its application to any life insurance policy of which the bankrupt is the owner and the beneficiary, whether or not he is also the insured. Yet it seems equally clear that to give such a broad effect to the proviso would produce a result both unreasonable and plainly in conflict with the clear intent of Congress. The unmistakable purpose of the proviso was to permit a bankrupt who had taken out a policy of life insurance on his own life for the benefit of his estate, perhaps many years before his bankruptcy, to keep the policy, which time might have made it impossible for him to replace, by paying over to his trustee in bankruptcy for the benefit of his creditors any cash surrender value which the policy might then have. This evident Congressional intent was long ago recognized by the Supreme Court in Burlingham v. Crouse, *supra*, where the Court said:

> In passing this statute Congress intended, while exacting this much (payment by the bankrupt to the trustee of the present value of the policy), that when that sum was realized to the estate the bankrupt should be permitted to retain the insurance which, because of advancing years or declining health, it might be impossible for him to replace. It is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched. In the light of this policy the act must be construed. We think it was the purpose of Congress to pass to the trustee that sum which was available to the

---

8. In Curtis, the bankrupt was the unconditional assignee and the beneficiary of a life insurance policy on the life of her husband. At the time of bankruptcy the cash surrender value of the policy was pledged to secure a loan, so that the policy had no net cash surrender value. The husband died shortly after the wife's bankruptcy, and the court awarded the proceeds to the bankrupt as after-acquired property. Jacobsen and Clark followed Curtis without extended analysis. Jacobsen presented the same facts as Curtis, except that the policy had a small cash surrender value. Involved in Clark was a bankrupt father-son partnership, in which each owned an insurance policy on the life of the other. The father was killed shortly after the bankruptcy, and the court directed that after payment of the cash surrender value to the trustee, the proceeds of the insurance policy on the father's life be paid to the son.

9. In Beachley, the bankrupt was the unconditional assignee of a life insurance policy upon the life of one Smith, who was no relation to the bankrupt. At the time of bankruptcy the policy had a cash surrender value, which the bankrupt tendered to the trustee. The court held that the trustee properly rejected the tender and that the trustee, not the bankrupt, was entitled to the policy.

bankrupt at the time of bankruptcy as a cash asset, otherwise to leave to the *insured* the benefit of his life insurance. 228 U.S. at 473, 33 S.Ct. at 568. (emphasis supplied)

The "humanitarian" [10] purpose of Congress also appears clearly from the legislative history of the proviso, which was first enacted as a part of the Bankruptcy Act of 1898 (July 1, 1898, ch. 541 § 70, 30 Stat. 565). The legislative history is sparse, but includes a brief colloquy on the floor of the House in which Representative Henderson, Chairman of the House Judiciary Committee, in response to a question, expressed the purpose of the proviso in these words:

* * * [T]he purpose of the provision * * * was this: That where a man who becomes insolvent is carrying life insurance, not for the benefit of his wife, or children, but life insurance which belongs to his estate, its present cash value, if it can be ascertained, shall be paid or secured, but without subjecting the man to the necessity of reinsuring at an older age than that at which the policy was taken. Our bill proceeds upon the presumption that in such cases the policy ought to go into the man's estate and belong to his creditors; but the provision is so worded that if, for instance, the policy was taken at the age of 21 and the man is now 51, he should be allowed to carry the policy at the existing rate and not at the rate of the later age. 31 Cong.Rec. 1792 (1898) (remarks of Representative Henderson).[11] The Congressional intent is further evidenced by the 1928 amendment,[12] which made clear that only bankrupts who are natural persons are entitled to the protection of the proviso.

And finally, it is against this background that Collier observes:

Cases where the bankrupt is a beneficiary named in an insurance policy issued on the life of another should not be confused with the cases, previously discussed, where the bankrupt was the insured.

While it is literally possible for a bankrupt beneficiary to come within the language of the second proviso of § 70a(5), it is generally regarded as applicable only to a bankrupt insured. In any event the fact that a policy has no surrender value to a beneficiary is immaterial with respect to the title of the trustee of such a beneficiary in bankruptcy. If a policy in existence at the time of bankruptcy names the bankrupt as beneficiary without any reservation by the insured of the power to change such designation, the bankrupt has a vested though potential interest that vests in the trustee as an asset of the estate, subject, of course, to the conditions that the property is transferable or leviable and is not exempt. 4A Collier ¶ 70.-

---

10. *See* Curtis v. Humphrey, 78 F.2d 73, 74, 103 A.L.R. 236 (5th Cir. 1935) (Sibley, J., concurring):

  I concur in this judgment, yielding to the literal words of the act * * *. But I believe strongly that Congress intended something humanitarian, as in matters of homestead, and had in mind only individual bankrupts and insurance policies on their own lives.

11. The legislative history is set out in Cohen, The Role of Life Insurance as an Asset in Bankruptcy: Part I, 28 Va. L.Rev. 211, 217–225 (1941). The only other indication of Congressional intent is to be found in the report of the House Judiciary Committee, where the proviso first made its appearance. This report, also authored by Representative Henderson, contains the following brief comment:

  A provision is also recommended for protecting parties holding life insurance for the benefit of their estates where a cash surrender value can be ascertained, and permits the bankrupt to secure the trustee for the cash value or pay for the same and then hold and continue his policy without being interfered with by bankruptcy proceedings. H.R.Rep.No. 65, pt. 1, 55th Cong., 2d Sess. (1897).

12. *See* n. 7, *supra.*

23[7] at 334–335. (footnotes omitted) [13]

Other commentators agree that the proviso, correctly construed, is applicable only to a bankrupt insured. 3 Remington § 1246 at 109; Cohen, Life Insurance, *supra* n. 11, 28 Va.L.Rev. at 247–249; Case Note, 34 Mich.L.Rev. 1028 (1936) (criticizing Curtis v. Humphrey, *supra*); Case Note, 39 Col.L.Rev. 507 (1939) (criticizing In re Jacobsen, *supra*); Case Note, 87 U. of Pa.L.Rev. 344 (1939) (criticizing In re Jacobsen, *supra*); Burnett, Life Insurance as an Asset in Bankruptcy, 3 Cornell L.Q. 253 (1918); Note, Rights of the Trustee in Bankruptcy under Modern Life Insurance Policies, 35 Harv.L.Rev. 80 (1921).

■ In view of these considerations, the Court is persuaded that this is one of those cases where the literal meaning of apparently unambiguous statutory language must give way to a contrary Congressional intent. *Cf.* Perry v. Commerce Loan Co., 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966) [14]. In enacting the proviso to Section 70, sub. a

(5) Congress plainly had in mind no more than to permit a bankrupt to retain the benefit of insurance policies he had taken out on his own life for the protection of his dependents after his death. It was clearly not the intent of Congress to preserve for the bankrupt insurance which, as here, had been taken out by him on the life of an employee as "business insurance" for the protection of the bankrupt's business in the event of the employee's death. A construction of the statute which would permit a bankrupt to keep such a policy, free from the claims of his creditors, would be an unwarranted perversion of the clear Congressional intent and plainly at variance with the underlying policy of the Bankruptcy Act to make available for distribution among a bankrupt's creditors all his business assets not otherwise specifically exempt.

■■ For the foregoing reasons, the Court concludes that the proviso to Section 70, sub. a(5) is operative only with respect to insurance policies owned by a bankrupt on his own life. It follows

13. Collier also states:
    The second proviso of § 70a(5) was undoubtedly intended to apply only to a policy payable to the bankrupt insured, his estate or personal representatives. (Footnote omitted) 4A Collier ¶ 70.23 [4] at 328.
    Collier's view is supported by several early cases and comments in which it was assumed without discussion that the proviso only extends to bankrupts who themselves are the insureds: Wolter v. Johnston, 34 F.2d 598, 600, 68 A.L.R. 1211 (3rd Cir. 1929); Lincoln National Life Ins. Co. v. Scales, 62 F.2d 582, 584 (5th Cir. 1933); Clements v. Coppin, 61 F.2d 552, 558 (9th Cir. 1933); In re Judson, 188 F. 702, 705 (S.D.N.Y.1911); Ruckel v. Metropolitan Life Ins. Co., 119 Kan. 593, 596–597, 240 P. 409, 410 (1925); Schwartz, Life Insurance Policies in Bankruptcy Proceedings, 13 St. John's L.Rev. 18, 21–26 (1938); Note, Bankruptcy—Life Insurance as an Asset, 16 Va.L.Rev. 271 (1930).

14. In Perry, the Supreme Court held that confirmation of a wage earner extension plan under Chapter XIII of the Bankruptcy Act is not barred under Sections 656(a) (3) and 14(c) (5) of the

Act by a discharge in bankruptcy within the previous six years. One basis of the Court's holding was that even though a literal reading of the statutory language would suggest a contrary result, the Act should be construed to effectuate its clear purpose. In so concluding, the Court quoted with approval the following language from United States v. American Trucking Assns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940):
    There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. 383 U.S. at 400, 86 S.Ct. at 857.

that in the present case the proceeds of the life insurance policy owned by Wemyss on the life of Lloyd MacDonald passed to the Trustee as an asset of the bankrupt estate.

## II

### *The Renewal Commissions*

The conflicting claims of the parties with respect to the renewal commissions earned by Wemyss under his employment contract and presently being withheld by Mutual are as follows: Mutual contends that under the employment contract it is entitled to retain the commissions and to apply them in satisfaction of Wemyss' indebtedness to it. Globe and Lumbermen's join in Mutual's position, but take the further position, which Mutual contests, that the commissions must first be applied to offset Mutual's defalcation loss, thereby reducing *pro tanto* the liability of Globe and Lumbermen's under the fidelity bonds. The Trustee claims that by virtue of Wemyss' bankruptcy the renewal commissions passed to him as an asset of the bankrupt estate. Finally, the Bank asserts that by reason of its 1961 assignment it is entitled to so much of the commissions as is required to satisfy Wemyss' indebtedness to it.[15] These claims will be separately discussed.

### A

The first question presented is whether Mutual or the Trustee has a prior claim to this fund. It is undisputed that under the terms of his employment contract with Mutual, Wemyss, or his estate, was entitled to receive commissions upon all premiums due, collected and paid upon policies written by him or his general agency before termination of his employment. It is also uncontroverted that Wemyss' right to receive these commissions was in no way conditioned upon his future services to Mutual. Under these circumstances it is settled law that as a general proposition Wemyss' contract right to future renewal commissions would pass to his trustee in bankruptcy as a non-exempt transferable property right pursuant to Section 70, sub. a(5) and (6) of the Bankruptcy Act, 11 U.S.C. § 110(a) (5) and (6) (1964).[16] In re Wright, 157 F. 544 (2d Cir. 1907); Equitable Life Assurance Society v. Stewart, 12 F.Supp. 186, 191–192 (W.D.S.C.1935); In re Fahys, 18 F.Supp. 529 (S.D.N.Y.1937). *See* In re Leibowitt, 93 F.2d 333, 335 (3rd Cir. 1937), cert. denied, Stein v. Leibowitt, 303 U.S. 652, 58 S.Ct. 750, 82 L.Ed. 1113 (1938); 4A Collier ¶ 70.34.

In the instant case, however, Wemyss was indebted to Mutual to the extent of some $30,376.21 as of the date of his bankruptcy. Furthermore, his employment contract contained the following provision:

> Section 7. *Indebtedness.* The Company is hereby given a first lien on all compensation accruing under this agreement as security for any indebtedness of the General Agent which may exist at any time, whether arising under this agreement or otherwise, and may offset any such indebtedness against said compensation.[17]

---

15. Wemyss himself asserts no claim to the renewal commissions.

16. Section 70, sub. a(5) and (6) of the Bankruptcy Act provides in part as follows:

    The trustee of the estate of a bankrupt * * * upon his * * * appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered * * * (6) rights of action arising upon contracts, * * *.

17. The quoted provision is from the most recent renewal of Wemyss' employment contract, dated July 1, 1965. The comparable provision in the prior agreement,

It is thus clear that under his contract Wemyss had no right to receive any renewal commissions until his outstanding indebtedness to the company was satisfied in full. Although under the Bankruptcy Act the Trustee succeeded to any right of action Wemyss had under the contract, it is axiomatic that "[i]n all cases where the trustee seeks to assert or enforce the bankrupt's right of action against another, he stands in the bankrupt's shoes regarding defenses to the action." 4A Collier ¶ 70.28[1] at 385. (footnote omitted) The effect of Section 70, sub. a(5) and (6) of the Bankruptcy Act was to vest in the Trustee as of the date of bankruptcy whatever right Wemyss then had to receive future renewal commissions under his contract. But the Trustee's right can rise no higher than Wemyss' right at that time, and the only right of Wemyss under the contract was to be paid any renewal commissions which might remain after his indebtedness to Mutual was satisfied. As Mutual points out, the contract itself defines the asset, and the Trustee can claim no more than the "net proceeds" of the contract, i. e., any excess of commissions remaining after Mutual has been reimbursed in full.

In Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed. 2d 190 (1962), the Supreme Court applied the principle here involved in an analogous factual context. That case involved the conflicting claims of the trustee in bankruptcy of a government contractor and the contractor's payment bond surety to funds earned by the contractor but withheld by the government pursuant to the terms of the contract until final completion of all work covered by the contract. The contractor had defaulted before finishing the contract, and the surety had been compelled to complete the contract and to pay the laborers and materialmen of the defaulted contractor. The Court held that since the surety had completed the contract

and paid the laborers and materialmen, it was entitled by subrogation to the retained fund. The majority and concurring opinions disagreed as to whether the surety was subrogated to the government's right to use the retained fund to pay laborers and materialmen, to the latter's right to be paid from the fund, or to the contractor's right to receive the fund if it completed its job. But both opinions were in agreement that since the retained funds were payable to the contractor only if it fulfilled its contract, they never became a part of the bankrupt estate. As the majority opinion observed:

> Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another. Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simply priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors. (footnote omitted) Id. at 135–136, 83 S.Ct. at 234.

See also Polish v. Johnson Service Co., 333 F.2d 545 (3rd Cir. 1964); In re Cohen, 20 F.Supp. 298, 304–305 (S.D.N.Y. 1937); Bennett v. Aetna Insurance Co., 201 Mass. 554, 556, 88 N.E. 235, 236 (1909).

■ In the present case, as in Pearlman, the renewal commissions were payable to Wemyss only if he had not outstanding indebtedness to Mutual. Since at the date of bankruptcy he was indebted to Mutual in an amount substantially in excess of the renewal commissions presently being held by Mutual, the commissions never became a part of the bankrupt estate, and under the terms of the employment contract Mutual is en-

dated February 1, 1958, used the word "debt" instead of "indebtedness" wherever it appeared. Otherwise, the provisions are identical.

titled to apply them in satisfaction of Wemyss' indebtedness to it.[18]

## B

The claim of Globe and Lumbermen's that Mutual must first apply the commissions to recoup the losses caused by Wemyss' defalcations, thereby reducing their liability to indemnify Mutual for such losses, requires little discussion. The contention of these two defendants rests upon the so-called "salvage" clauses of their indemnity contracts, which provide that in the event of a recovery by the insured on account of any indemnified loss, the subrogated insurer is entitled to make itself whole from such recovery. But to give Globe and Lumbermen's the benefit of any recovery to which Mutual is entitled before Mutual has recouped its advances to Wemyss would permit indemnification of the indemnitor at the expense of the indemnitee in clear conflict with the principle that an insurer is entitled to share by subrogation in the assets of the principal debtor's estate only to the extent that "the right of one seeking subrogation must have greater equity than the rights of those opposing it." 11 Appleman, Insurance Law and Practice § 6502 at 295 (1944). The rule here applicable is that stated by the court in American Surety Co. v. Bethlehem National Bank, 33 F.Supp. 722 (E.D.Pa), rev'd on other grounds 116 F.2d 75 (3rd Cir. 1940), rev'd 314 U.S. 314, 62 S.Ct. 226, 86 L.Ed. 241 (1941):

> The doctrine of subrogation is a device adopted or invented by equity to provide that debts ultimately will be discharged by those who in good conscience ought to pay them. Conversely, it is an appropriate means of preventing unjust enrichment. If a surety is made to pay, it is only just that he should have full reimbursement, out of the assets of the principal debtor, so far as it can be given him without injustice to others. The rights and interests which must be balanced in determining what is a just distribution are those of the surety, the creditor whom he has secured, and the general creditors.

> As long as the creditor remains unpaid in whole or in part it would be obviously unfair and unjust to him to permit the surety to receive any part of the estate of an insolvent debtor. To do so would decrease the creditor's dividend by his proportionate share of the payments to the surety, and thus allow the surety to compete against him—in derogation of the purpose of his contract of suretyship. 33 F.Supp. at 723–724.

In the present case, Mutual paid to Globe and Lumbermen's substantial premiums to protect itself against loss by reason by Wemyss' defalcations. To permit these two defendants to share in the benefit of Mutual's contractual right to the renewal commissions before Mutual has been made whole on its advances to Wemyss would be to require Mutual to bear the burden of a loss which it had paid these insurers to assume for it. Globe and Lumbermen's are not entitled to such a windfall. To avoid this uncon-

---

18. The set-off provisions of Section 68, sub. a of the Bankruptcy Act, 11 U.S.C. § 108(a) (1964), have been suggested as an alternative basis upon which Mutual may retain the renewal commissions and offset them against Wemyss' indebtedness to it. To the extent that Mutual is withholding commissions accrued prior to bankruptcy, in the agreed amount of $176.09, the Trustee concedes that such a set-off is proper. See 4 Collier ¶ 68.-04 [2]; 3 Remington § 1443. However, with respect to the commissions collected subsequent to bankruptcy, since these were not "owed" by Mutual as of the date of bankruptcy, the mutuality requirement for a set-off under Section 68a is not met. See Avant v. United States, 165 F.Supp. 802, 805 (E.D.Va. 1958); McDaniel National Bank v. Bridwell, 74 F.2d 331, 333 (8th Cir. 1934); Reed v. Barnett National Bank of Jacksonville, 250 F. 983, 984 (5th Cir. 1918); 4 Collier ¶ 68.10 [1]. Cf. New York County National Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904); Studley v. Boylston National Bank, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313 (1913); In re Montgomery Bros., 51 F.2d 284, 286 (S.D.Miss.1931).

scionable result, Mutual is entitled to apply the renewal commissions first to satisfy its advancement losses before applying any part of them to recoup the losses caused by Wemyss' defalcations.

## C

The basis of the Bank's claim to the renewal commissions is the 1961 assignment to it by Wemyss of his right to all future renewal commissions under his employment contract, as security for loans by the Bank to him. The Bank's assertion that this assignment gives it a claim to the renewal commissions which is prior to Mutual's is sufficiently answered by reference to the assignment and Mutual's consent thereto, which expressly advised the Bank of the fact that the assignment and consent were subject to Mutual's right of set-off as reserved in the employment contract. The assignment contained the following provision:

It is expressly agreed that this assignment is subject to the right of said Insurance Co. and or General Agents under the terms of said agency contracts to deduct from said renewal commissions any and all indebtedness now due or which may become due from me to said Insurance Co. and or General Agents under said contracts and to make deductions for any regularly established retirement plan provided for its agents by the Insurance Co.

The consent to assignment executed by Mutual provided:

The undersigned hereby consents to the foregoing assignment subject to and reserving to the Insurance Co. and to the General Agents the right under the terms of said agency contracts to deduct from said renewal commissions any and all indebtedness now due or which may hereafter become due from assignor to the Insurance Co. and or General Agents, and to make deductions for a retirement plan such as provided for in said assignment, and

such indebtedness shall include any future indebtedness of the assignor to the insurance company.

Additionally, the employment contract referred to in both the assignment and the consent [19] contained the following:

7. *Indebtedness.* The Company is hereby given a first lien on all compensation accruing under this agreement as security for any debt of the General Agent which may exist at any time, whether arising under this agreement or otherwise, and may offset any such debt against said compensation.

8. *Assignment.* No assignment of this agreement or of any of the commissions or other rights accruing to the General Agent hereunder shall be valid unless consented to in writing by the Company in advance. All assignments shall be subject to the rights of the Company as provided in Section 7.

The foregoing documents make plain beyond doubt that in accepting the assignment of Wemyss' right to future renewal commissions as security for its loans, the Bank was fully aware that its right to receive the commissions was subject to Mutual's paramount right under the employment contract to deduct therefrom any and all indebtedness owed by Wemyss to it. The Bank's present claim of a prior right to these commissions as against Mutual is without merit. Worthen Bank and Trust Co. v. Franklin Life Insurance Co., 370 F.2d 97 (8th Cir. 1966).

## III

### Globe's Liability to Mutual

It is stipulated that Globe's liability to mutual under the fidelity bond issued by Globe insuring Mutual against the defalcations of Wemyss during the period from November 1, 1964 through November 1, 1967 is $16,459.33, for which Mutual has filed a proof of claim complying with the terms of the bond. Since the

---

19. The employment contract in effect at the time of the 1961 assignment to the Bank was the agreement dated February 1, 1958.

Court has concluded that Globe is not entitled to offset against this liability any part of the life insurance proceeds or of the renewal commissions involved in this case, Mutual is entitled to recover of Globe the stipulated sum of $16,459.33, with interest.

\* \* \*

Judgment will be entered declaring the rights of the parties in accordance with this opinion. Plaintiff will submit a proposed form of decree, with notice to defendants, within ten days. Defendants will present their comments thereon within five days thereafter.

It is so ordered.