## MILLER v. WOOLLEY.
### No. 10460.

Circuit Court of Appeals, Ninth Circuit.
March 20, 1944.

Rehearing Denied April 27, 1944.

B. E. Ahlport and Bertram H. Ross, both of Los Angeles, Cal., for appellant.

Frank P. Doherty, Reuben G. Hunt, and Joseph F. Rank, all of Los Angeles, Cal., for appellee.

---

Before WILBUR, MATHEWS, and STEPHENS, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from an order of the United States District Court reversing an order of the referee in bankruptcy which required the appellee to pay to the trustee in bankruptcy the sum of $5,950 [1] which had been paid to appellee by John Barrymore as a part of the fee in a divorce case instituted by John Barrymore while a proceeding for an arrangement between Barrymore and his creditors, under chapter 11 of the Bankruptcy Act, was in progress. Concurrently with the filing of his petition for arrangement, under 11 U.S.C.A. § 722, on June 5, 1940, the debtor, John Barrymore, filed a petition stating that he was earning $5,000 per week in his profession as an actor; that it had been his practice to expend approximately $1,000 per week for his "household and necessary expenses" and asked the court to "fix his drawing account from his earnings" and alleged that a reasonable drawing account pending a further order of court "as and for his living expenses herein and for his services herein should be and is the sum of $1,000 per week." The petition prayed that an order be made "fixing his drawing account for his household expenses and necessities at the sum of $1,000 per week, subject to the further order of this court." The order of the referee made on the same date ordered "that the drawing account of said debtor be and the same is hereby fixed in the sum of $1,000 per week, subject to the further order of this court."

During the pendency of the proceedings there were numerous meetings of the creditors before the referee. During these proceedings the disposition of the $1,000 per week paid the debtor was discussed.

On September 20, 1940 the debtor entered into a written contract wherein he agreed to pay to appellee Roland Rich Woolley the sum of $10,000 as a fee in a divorce suit to be instituted on his behalf by Mr. Woolley. On September 30th appellee Woolley and Hiram E. Casey were substituted as attorneys for the debtor in the arrangement proceeding. It should be observed that at the time the allowance of $1,000 per week was made by the court and at the time the contract for employment of appellee as an attorney in the divorce action was made the debtor was represented in the arrangement proceedings by other lawyers. So far as the representations are concerned which were made by the debtor to the referee in procuring the allowance in June 1940, the appellee Woolley had no connection therewith nor responsibility therefor. Under the agreement made by Mr. Woolley with the debtor the allowance of $1,000 per week repaid to the debtor by the receiver in the arrangement proceedings was turned over to appellee Woolley when received and disbursed by him on behalf of the debtor to pay expenses, each disbursement being approved by the debtor. Appellee had retained on account of his services to the debtor in the divorce case the sum of $5,950. The retention of these amounts was approved by the debtor.

The theory upon which the referee ordered appellee Woolley to pay over to the trustee in bankruptcy [2] the sum of $5,950 was that the weekly allowance to the debtor would not have been continued at so high a figure if the appellee had not concealed the fact that he was being paid attorney fees from the allowance. The trial court, upon review, considered and held that the money paid to the debtor as an allowance belonged to him and that the debtor's estate in the arrangement proceedings had no concern with the disposition the debtor made of the allowance.

Before proceeding further it should be stated that the law concerning arrangements (ch. 11, Bankruptcy Act) makes no provision for the payment of moneys to a debtor by way of allowances for living expenses. The power of the bankruptcy court in arrangement proceedings over the future earnings of the debtor is entirely dependent upon the arrangement proposed by the debtor in his petition for confirmation of the arrangement. The basic question then is, what was the arrangement proposed by the debtor and to what extent did the debtor yield jurisdiction over his future earnings. To determine this matter will involve some consideration of the proceedings before the bankruptcy court which we will state as briefly as may be.

[1] The appellee has $619.65 additional in his hands which he consented to turn over to the trustee, and it was so ordered.

[2] The debtor was declared a bankrupt after his death because the cessation of his earnings made it impossible to carry out the arrangement. 11 U.S.C.A. § 777.

The debtor owed the United States government $25,000 income tax for his fiscal year 1938, together with interest and penalties due to the default in payment. He owed over $5,000 for income taxes to the state of California. He owed large amounts of delinquent taxes to the county of Los Angeles. He also owed some preferred debts to laborers and others to general creditors. His assets were heavily encumbered with little prospect of any recovery therefrom for the benefit of general creditors. The only substantial source for payment of these obligations was money derived by the debtor from his current earnings which he estimated in his petition to be over $250,000 per annum. These earnings, as soon as realized, were subject to the lien of the United States government for the income taxes of 1938, amounting to about $30,000, and also gave rise to additional income taxes for the current year of 1940 for about the same amount as estimated,[3] and to California state income taxes, amounting to about one-fifth of the federal income taxes.

In his petition for the arrangement the debtor enumerated his property and his obligations and offered an arrangement to pay into court each week the sum of $1,500 to be devoted to the payment of his general creditors, such payments to be continued until the creditors were paid in full. He also offered to pay all outstanding taxes.

The claims for these taxes were preferred claims and were secured by tax liens upon all the property of the debtor. The debtor did not state how nor in what manner he would pay these taxes, but it is fairly to be inferred from his attitude at the time he secured his allowance of $1,000 per week from the court that he intended to pay into the court all his earnings, alleged to be $5,000 per week, and to have returned to him the sum of $1,000 per week. It is reasonable to say that his proposal as made in his petition for the arrangement contemplated the payment to the receiver of his estate of all his wages on condition that he be repaid the sum of $1,000 per week.

As to the amounts which were to be paid for taxes, the federal and state governments were interested in the proceedings although the court had no authority over these preferred claims except to see that their priorities were preserved.[4] The general creditors were interested in the discharge of these overriding liens. The unsecured claims had no right to payment from current or future earnings of the debtor.[5] It is fair to say that the arrangement tendered by the debtor, as qualified by the accompanying petition for an allowance of $1,000 per week from his future earnings was one in effect to pay over to the receiver all his earnings except $1,000 per week, although his proposed "arrangement", was to pay only $1,500 per week,

---

[3] The 1939 income taxes had been paid before debtor's petition was filed in the arrangement proceedings.

[4] 11 U.S.C.A. § 707. *"Creditors; debts; claims.* Unless inconsistent with the context and for the purposes of an arrangement providing for an extension of time for payment of debts in full and applicable exclusively to the debts to be extended—

"(1) 'creditors' shall include the holders of all unsecured debts, demands, or claims of whatever character against a debtor, whether or not provable as debts under section 103 of this title and whether liquidated or unliquidated, fixed or contingent; and

"(2) 'debts' or 'claims' shall include all unsecured debts, demands, or claims of whatever character against a debtor, whether or not provable as debts under section 103 of this title and whether liquidated or unliquidated, fixed or contingent."

11 U.S.C.A. § 756. *"Modification of rights of unsecured creditors.* An arrangement within the meaning of this chapter shall include provisions modifying or altering the rights of unsecured creditors generally or of some class of them,

upon any terms or for any consideration."

11 U.S.C.A. § 771. *"Discharge of unsecured debts upon confirmation.* The confirmation of an arrangement shall discharge a debtor from all his unsecured debts and liabilities provided for by the arrangement, except as provided in the arrangement or the order confirming the arrangement, including the claims specified in section 754 of this title, but excluding such debts as, under section 35 of this title, are not dischargeable."

[5] 11 U.S.C.A. § 752. *"Rights, duties and liabilities of creditors, etc.* Where not inconsistent with the provisions of this chapter, the rights, duties, and liabilities of creditors and of all other persons with respect to the property of the debtor shall be the same, * * * where a petition is filed under section 722 of this title, as if a voluntary petition for adjudication in bankruptcy had been filed and a decree of adjudication had been entered at the time the petition under this chapter was filed."

In re Leibowitt, 3 Cir., 93 F.2d 333, 335, 115 A.L.R. 623. Wages of a bankrupt after adjudication are not subject to claims of the estate.

from which he requested his allowance of $1,000 per week. To state it somewhat differently, it was a proposal to retain $1,000 per week and to pay $500 per week to the receiver for the general creditors, and the balance of the debtor's earnings to go to pay his obligations to the state and federal governments and other secured or preferred claims.

No creditor questioned the right of the debtor to retain the moneys paid to him weekly by way of an allowance, but during the progress of the proceedings it was suggested by some of the creditors to the referee and also by the referee that perhaps this amount was too large, and inquiries were made as to the disposition and need of it, but these inquiries were directed largely to the question of the acceptance by the creditors of the proposed arrangement and the three amendments to the arrangement originally proposed. During this period negotiations were carried on in open court between the creditors and the debtor's attorneys and the United States government concerning the acceptance of the proposed arrangements as modified from time to time by the debtor to meet the objections of the creditors. It was not until June 19, 1941, slightly more than a year after the original petition was filed and after the debtor had paid the receiver over $100,000 from his earnings in anticipation of the acceptance of his plan or arrangement by his creditors and confirmation by the court, that the third amended proposed arrangement was consented to and confirmed by the court. No accounting was made or required by the court as to the sum returned to the debtor by the receiver under order of court; the confirmation dealt only with the money in the hands of the receiver and with the debtor's future earnings.

The first amended proposed arrangement, filed February 7, 1941, provided that "all earnings of the debtor * * * earned and payable after the adoption and approval of this plan" subject to certain deductions specified should be paid to the custodian or disbursing agent. It was proposed by the debtor that from his earnings a weekly sum of $600 be paid to the debtor and that an additional sum of $400 per week be placed in a reserve fund to be paid to the debtor if and when his earnings were insufficient to pay him the $600 per week. It was stated: "It is the intention and purpose to provide petitioner with $600.00 per week for his personal living expenses so long as he may either earn said amount or there shall be in said special reserve fund an amount sufficient to permit the payment of the said $600.00 per week to your petitioner."

On March 18, 1941, an amendment to the amended proposition of the debtor was filed. This also provided for the payment of $600 per week to the debtor, $200 per week to his children, and $400 per week to be paid into the reserve fund. Payments in the reserve fund were to continue until the amount in the reserve was equal to $7,500. Subsequent payments were to be limited to the amounts necessary to continue the reserve at $7,500. The amendment to the first amended proposition for the arrangement made March 18, 1941 eliminated the provisions with reference to "his personal living expenses" and provided directly for the payment of $600 per week to the debtor and $400 per week in the reserve fund without any statement that the weekly payments were for living expenses. The next day, March 19, 1941, the referee made an order directing that $600 per week be paid to the debtor in place of any amount theretofore paid to him on account of his personal expenses. Three hundred dollars per week was ordered paid into a special fund "to be earmarked as a reserve account to be used for such purposes as the court may hereinafter direct by a further order."

The second amended proposition, filed April 9, 1941, provided for the payment to the debtor of the sum of $700 per week, $200 a week additional to support debtor's children, and $400 per week to be paid into the reserve fund. Nothing is said as to the purpose for which this money is to be paid to the debtor except that in the proposed amended arrangement it is stated that "heretofore the referee herein fixed the sum of $1,000.00 per week as a reasonable amount for the support and maintenance of petitioner;" that the amount had thereafter been reduced to $900, and later to $600, plus a reserve of $300 per week.

In the meantime the receiver filed reports and accounts showing that he had received altogether from the earnings of the debtor during the pendency of the proposed arrangement $106,536.18, and that he had disbursed $72,254.97, leaving the balance on hand, $34,281.21. On May 17, 1941 an order was made substituting other

attorneys for the debtor in the place of the appellee and Hiram Casey.

On June 19, 1941 an order was made approving, with modifications, the plan of arrangement as embodied in the second amended proposition, and providing that all future earnings of the debtor should be paid into a general fund and disposed of in accordance with the provisions of the order of confirmation and providing for the payment to the debtor of the sum of $700 per week, the court reserving the right to modify the weekly payment for any reason. It provided for the payment of $200 a week for the maintenance of the debtor's children, for the payment of $400 per week into the reserve fund to be applied on the weekly payments to the debtor and his children or otherwise as the court might direct.

It will be observed that there was no agreement or obligation upon the part of the bankrupt to pay any money upon his proposed plan of arrangement until the confirmation of his plan of arrangement on June 19, 1941.

The earnings of the debtor, whether deposited with the court or retained by him, were subject to the tax lien of the federal government, aggregating over $25,000. All the moneys paid out by the referee from the funds were subject to the lien of the federal government in the hands of the payees or transferees if they took with actual or constructive knowledge of the lien. 26 U.S.C.A. Int.Rev.Code, §§ 3670, 3672; see Investment and Securities Co. v. United States, 9 Cir., 140 F.2d 894.

It was not until the federal government had received payments from the accumulated earnings of the debtor in full satisfaction of its claims that the moneys paid to the appellee and to others were finally relieved of the tax lien for the taxes of 1938.

Another factor to be considered is that the debtor died on May 29, 1942, before the arrangement confirmed on June 19, 1941 had been fully carried out; that on July 1, 1942 the deceased debtor was declared a bankrupt as permitted by 11 U.S. C.A. § 26. We need not discuss the effect of this adjudication of bankruptcy, which is not discussed in the briefs, further than to state that the bankruptcy adjudication by the terms of the statute related back to the filing of the original petition for the arrangement on June 5, 1940, and, consequently, the earnings of the debtor thereafter, that is, from June 5, 1940 to July 1, 1942, under bankruptcy proceedings belong to him subject only to liens for taxes and to the rights of attachment or garnishment by those having claims which cannot be discharged in bankruptcy. The order of the referee requiring the appellee to pay $5,950 to the trustee in bankruptcy was made on September 25, 1942, nearly three months after the status of the bankrupt and the creditors had been changed by the adjudication in bankruptcy.

The proceedings which resulted in the order appealed from were initiated by the debtor on October 3, 1941. In this petition he alleged that he had agreed to pay the appellee $10,000 for his services as attorney at law in the divorce case which he was to institute for the debtor and that the fee of $10,000 was to cover the petitioner's services in the arrangement proceedings in the bankruptcy court as well as in the divorce proceeding to be instituted and that the appellee had paid himself from the funds of the debtor without the approval or knowledge of the court. The debtor asked that the fee be reduced proportionately and the balance be returned to the petitioner or the receiver.

This petition was answered by appellee on October 17th. The appellee set out the written agreement between the parties which showed the fee did not include services in the arrangement proceedings. On October 27, 1941 the debtor amended his petition alleging that the contract with appellee for his services in the divorce matter was not approved by the court and that the court was not informed of the fact that moneys paid to the debtor "for his living expenses" were being applied to the payment of said attorney's fees. The appellant alleged that the various allowances made to him for his living expenses were made by the court upon the representation by appellee that the sums so allowed were necessary for petitioner's maintenance and that the fact that during said period of time appellee paid to himself out of said funds the sum of $6,900 was concealed from the court. The prayer was that the money be repaid to the receiver in the arrangement proceedings.

The receiver, after asking for instructions, intervened in the proceeding instituted by the debtor and the debtor's newly substituted attorneys notified the referee that in their opinion the fund of $5,950

should be ordered returned to the estate on the ground that the debtor's contract for the payment of the fees to the appellee was void because not approved by the court and that in maintaining the high allowance granted to the debtor the court was not advised that part of the funds were being used to pay the attorney's fees of appellee.

The question as to whether or not a $10,000 fee in the divorce matter was exorbitant or whether the agreement therefor was obtained by fraudulent misrepresentations as to the amount of labor involved in the divorce case has been eliminated from the case, no allegations upon that subject being contained in the amended pleadings upon which the matter was tried. No evidence was introduced as to what would constitute a reasonable fee in the divorce case. It appears the debtor made the contract without questioning the reasonableness of the fee and only raised the question when the divorce was obtained without contest because of his default upon the cross-complaint of his wife. If the money paid to the appellee on behalf of the debtor was the debtor's own money to do with as he saw fit, as we believe and hold, the question of whether or not the continuance of the order making the so-called allowance to the debtor resulted from concealment of facts is immaterial, and there is no basis for requiring the repayment to the bankrupt estate of the moneys repaid to the debtor in the form of an allowance. It was his money both before and after the order. It is true that until an accounting was requested by the referee the appellee did not disclose to the court that he was being paid large amounts from such allowance for attorney's fees. No concealment was practiced except such as was involved in the failure of the attorney to advise the court that he was receiving this money. The statements of appellee that the moneys to be paid to the debtor were necessary for his expenses were in most instances made in discussion of the proposed plan of arrangement and not with reference to the disposition of the money theretofore repaid to the debtor. Certain items of past expense were stated to the court with reference to servants, housekeeping expenses, etc., paid by the debtor, but in no instance did these amounts cover or purport to cover the entire allowance of $1,000 per week and in no instance did the court require a statement or the introduction of evidence on the subject of the disposition of the entire allowance until about August 1941 when appellee filed a detailed statement showing, among other things, the payment of the $5,950 to him for attorney fees. While it is a matter of acute interest to the appellee, we deem it unnecessary to discuss the question of professional ethics as to how far an attorney, under such circumstances, is bound by his obligation to maintain the secrets of his client and how far he is bound by his obligation not to deceive the court. In any event there is no basis for the order requiring the appellee to refund moneys paid to him by the debtor from his own funds under a valid contract of employment.

As to the jurisdiction of the court to compel the appellee to repay money paid to him by the bankrupt, it is clear that if the money so paid to appellee belonged to the debtor, as we hold, the court had no jurisdiction to order it paid to the trustee in bankruptcy. The real contest is between the debtor and the appellee. The question as to whether the order of allowance in the arrangement proceedings did or could limit the debtor's use of the funds allowed him if doubtful before the adjudication of bankruptcy is set at rest by a retroactive adjudication in bankruptcy which freed his earnings so far as the jurisdiction of the bankruptcy court is concerned from the claims of the bankruptcy court over his property.[6]

Order affirmed.

---

6 11 U.S.C.A. § 778. *"Procedure upon order directing that bankruptcy be proceeded with.* Upon the entry of an order directing that bankruptcy be proceeded with—* * *

"(2) in the case of a petition filed under section 722 of this title, the proceeding shall be conducted, so far as possible, in the same manner and with like effect as if a voluntary petition for adjudication in bankruptcy had been filed and a decree of adjudication had been entered on the day when the petition under this chapter was filed; and the trustee nominated by creditors under this chapter shall be appointed by the court, or, if not so nominated or if the trustee so nominated fails to qualify within five days after notice to him of the entry of such order, a trustee shall be appointed as provided in section 72 of this title."

In re Leibowitt, 3 Cir., 93 F.2d 333, 335, 115 A.L.R. 623. Wages of a bankrupt after adjudication are not subject to claims of the estate.