In re James G. DONAHUE, Madeline B. Donahue, Bankrupts.

**NORTH SHORE FUNDING CORP., Plaintiff,**

v.

James G. DONAHUE, Madeline B. Donahue, Defendants.

Bankruptcy Nos. 79–0854–G, 79–0855–G.

United States Bankruptcy Court, D. Massachusetts.

Jan. 4, 1982.

Jack Houghton, Pittsfield, Mass., for plaintiff.

Leon Aronsen, Aronsen & Kruger, Quincy, Mass., for defendants.

## MEMORANDUM AND ORDER

PAUL W. GLENNON, Bankruptcy Judge.

The question presented for decision is both unique and complex in that it involves a dispute between the bankrupts and an alleged creditor over the right to collect the bankrupt's monthly Army retirement pay. The dispute arose in the context of a complaint filed by North Shore Funding Corporation ("NSF") to have a debt owed to it by the bankrupts declared non-dischargeable under § 17 of the Bankruptcy Act. 11 U.S.C. § 35, as amended and prior to its revocation by the Bankruptcy Reform Act of 1978, Public Law 95–598. The plaintiff, NSF, filed its complaint as an alternative form of relief, its principal argument being that, in fact, no debt exists, but if there is a debt, it may be excepted from a discharge under § 17. The court today addresses only the question of whether in fact there is a justiciable dispute between these parties which may be properly addressed by the court. In effect, the decision today is declaratory in that it sets out the court's opinion of its own jurisdiction and of the exact nature of the dispute before it. For purposes of this decision, the facts are not in dispute.

## FACTS

James and Madeline Donahue each filed separate voluntary petitions for Chapter XI relief under the Bankruptcy Act on May 4, 1979. The cases were consolidated substantively on August 17, 1979, and the debtors were subsequently adjudicated bankrupt on October 23, 1980. The Donahues operated a Berkshire resort known as the Blantyre Castle located in Lenox, Massachusetts. In late 1977 and early 1978 the bankrupts were in need of financing to pay for on-going business operations at the Blantyre Castle. In that regard, Mr. Donahue contacted NSF regarding a possible loan. Mr. Donahue was and is a retired Lt. Colonel in the Army and was receiving monthly retirement pay in the approximate amount of $1000 per month. According to a letter from Mr. Donahue to Dr. Harold Gilston of NSF, dated January 5, 1977,[1] Donahue was to repay any loan from NSF by "allocating [his] army retirement check" to NSF "until the loan is paid in full". Enclosed with that letter was a copy of a letter which was to be sent by Mr. Donahue to the U. S. Army Finance and Accounting Center after his loan request was processed. That letter instructed the Army to send Donahue's monthly retirement check to NSF. The "allotment" of the monthly check was "to continue in effect until [his] loan in the sum of $55,875.68 was paid in full". The allotment was not to be changed without prior notification to NSF and "payments [were] to continue and [were] not to be revocable by [him]" until the loan was paid in full. Further, he directed that payments were to continue to NSF for four years and eight months, and this direction was made "irrevocable until the said sum of $55,875.68 has been paid and received by North Shore Funding". He reiterated these same instructions in a subsequent paragraph.

In a letter dated January 12, 1978 from a Major Smothermon to James Donahue regarding his request, the Army indicated that Donahue could request a change of address for his check for a specified period of time with conditions that no changes of address would be accepted without notification to NSF, but that the check itself would be made payable to Donahue, requiring him to enter into an authorization agreement with NSF to allow its negotiation of his check. On January 16, 1978, the Army sent formal notice of its acceptance of the change of mailing address to NSF, which change was to be effective February 1, 1978 for a period of 4 years and 8 months.

---

1. While the letter is dated "1977", all subsequent related documentation is dated "1978". As well, the loan itself was made in early 1978.

I can only conclude that the reference to "1977" in the letter was a mistake and that the actual date was meant to be "1978".

Pursuant to the loan agreement of January 16, 1978, NSF agreed to loan $38,000 at a 22% annual rate of interest to The Berkshire Resorts, Inc., a corporation of which the Donahues were the sole stockholders. Berkshire Resorts gave as collateral security a second mortgage on a property listed as "16 East Street, Lenox, Massachusetts". In addition, the Donahues personally guaranteed repayment of the loan. Finally, there was a clause included which is the crux of the dispute between these parties. That clause reads:

> As additional collateral security James G. Donahue hereby assigns to the undersigned [NSF] his retirement allotment which is presently in the net amount of $997.78 and hereby gives to the undersigned power of attorney to receive the said check of the United States Army Finance and Accounting Center with the right to endorse the said check so that the undersigned receives the proceeds and to continue to do so until the said loan is paid in full with interest. (Emphasis added).

This was the agreement between the parties for the loan of $38,000 by NSF and the repayment of $55,875.68 by The Berkshire Resorts, Inc., which was guaranteed by the Donahues. A subsequent loan of $14,797.12 was made by NSF in 1979, which was added to the original agreement, bringing the total amount due to $70,672.80. In effect, a loan was made to a corporate debtor, for which security was given. In addition, the personal guarantees of the sole stockholders were obtained. The dispute centers about the language of "assignment" contained in the agreement. The bankrupts argue that the assignment was made as security for repayment of the loan, i.e. that it was a pledge. North Shore Funding Corp. argues that the assignment was absolute and irrevocable—in effect, an assignment on account of an antecedent debt. NSF alleges, and it is undisputed, that Mr. Donahue notified the Army sometime after payments to NSF had commenced of his desire to have his retirement check returned to him and, at his request, the Army has discontinued the mailing of checks to NSF. As a result, NSF was unsure whether it should proceed in this court or some other, and therefore has filed its complaint here, but requests declaratory relief that this "property" is not property of the bankrupt. If such a determination is made, it is this Court's feeling that the matter would then lie for appropriate action by another court of competent jurisdiction. As I noted above, the decision today focuses on a preliminary question of jurisdiction and in no way addresses the substantive allegations of NSF's complaint.

## DISCUSSION

■ Initially, it should be made clear that NSF is essentially asserting two separate claims for relief in this court, each of which requires a distinct jurisdictional analysis. Part of the need for this decision today is as a result of each party's confusion regarding the nature of the problem. NSF seeks first, to have its debt declared non-dischargeable and second, to establish its right to collect that debt out of the bankrupt's retired pay. The first form of relief sought is a proceeding arising under § 2(a)(12) of the Act (11 U.S.C. § 11) over which the bankruptcy court has original and exclusive jurisdiction. See generally, Collier on Bankruptcy, vol. 1, ¶ 2.06 at pp. 152–59 (14th ed. 1978), and decisions cited therein. There can be no doubt, and it requires no further citation, that a complaint for non-dischargeability of a debt is exclusively for the bankruptcy court to determine.

■ NSF's claim that an assignment was made on account of an antecedent debt, thereby extinguishing the debt, is curious in light of its complaint seeking to have a "debt" declared non-dischargeable. In any event, the court finds that where a purported assignment is made to an entity by a debtor in contemporaneous exchange for the receipt of cash, which carries with it a requisite payment of a fixed rate of interest over a term of years, and for which additional collateral security was given in the form of a mortgage, is not an assignment on account of an antecedent debt. Therefore, to the extent that the debt remains

unpaid, NSF is a creditor of the bankrupts, based upon their guarantee of a *loan* to their corporation.

NSF, however, does not seek to satisfy its debt out of the bankrupt estate, but rather, would prefer to have the debt repaid by means of monthly payments from the bankrupt's retired pay. In effect, it seeks satisfaction of its debt out of the bankrupt's retirement pay while pressing its claim that the debt is non-dischargeable. The bankrupt claims NSF is a secured creditor, while NSF argues its rights in the "property" are independent of its loan. As a result, confusion has arisen over whether NSF is compelled to seek its remedy in this court or in some other, and over whether its complaint for non-dischargeability of a debt has in any way affected the court's jurisdiction as to the former aspect. Stated differently, the question is whether NSF can seek to enforce its rights in the retirement pay outside this court while contemporaneously seeking to have the underlying obligation excepted from a discharge.

Another way of looking at the problem is to say that if NSF is in fact called a secured creditor, it has three choices in bankruptcy: (1) it may prove its claim as an unsecured claim and surrender its security; (2) it may prove its claim as a secured claim and give the bankrupt credit for the value of the security;[2] or (3) it may choose not to prove at all and rely solely on the security.[3] These alternatives have been often recognized by the courts and are discussed generally in *Collier on Bankruptcy*, vol. 3, ¶ 57.07[3] at pp. 169–83 (14th ed. 1978). NSF seemingly wishes to opt for the last alternative, i.e., to not prove its claim and to rely solely on the security. In that case, however, if any deficiency were to occur and the claim was not proved, that portion which could have been proved might still be dischargeable, and the creditor would be left with no recourse on its deficiency. It is left, however, with its constitutionally protected lien rights in its security, but is prevented from sharing in the distribution of the debtor's estate. The discharge operates to extinguish those debts which are allowed and which are paid under a bankruptcy distribution. When a debt is declared non-dischargeable, it is nevertheless still allowable, and the creditor may share in the distribution of the bankrupt's estate. The non-dischargeability would then apply to that portion of the provable debt which is allowed but remains unpaid. So too, in this case, the non-dischargeability of NSF's debt goes only to that portion of the debt which would remain unpaid after satisfaction from the retirement pay, whether it be called security or not. Therefore, although the underlying obligation may be declared non-dischargeable, the secured creditor loses no rights in his security. He merely gains the additional right to pursue the debtor after bankruptcy for any deficiency which may arise as a result of the liquidation of his security.

While it is true that persons claiming liens in property subject to the bank-

---

**2.** The court is not sure at this time how such "security" could be valued, because of its highly prospective and speculative nature. As will be discussed below, the right to receive retired pay only vests as it is earned and therefore may be divested easily and quickly. Therefore, the current value of this "security", if we call it that, is minimal at best. It seems obvious, due to the amount of the debt involved and the lack of any other security, that NSF would like to avoid having its "security" valued by this court, since it is likely to receive little if any credit for it. Instead, it would prefer to take its chances that the bankrupt will continue to earn his retired pay.

**3.** Section 63 of the Act (11 U.S.C. § 103) specifies which debts may be proved and makes no distinction between secured or unsecured debt. Section 57 on the other hand, which designates which claims may be allowed, specifically limits allowance of a secured claim to that amount which the court determines is owing over and above the value of the creditor's security. 11 U.S.C. § 93; § 57(e) of the Act. Thus, a secured creditor may *prove* its claim in the full amount pursuant to § 63, but may only be *allowed* to share in the bankrupt's estate to the extent of any deficiency. See *Collier on Bankruptcy*, vol. 3A, ¶ 63.05 at p. 1777 (14th ed. 1978). In this case, it seems apparent that NSF wishes to avoid proof of its secured claim for purposes of allowance, and instead, seeks only to prove its claim for purposes of non-dischargeability.

ruptcy court's jurisdiction may be brought in by a show cause order and be compelled to prove their claim or be defaulted, see *In re Ripp*, 242 F.2d 849 (7th Cir. 1957), relying on *Sampsell v. Imperial Paint & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), the same is not true for persons claiming a lien on property which is *not* subject to the court's jurisdiction. Moreover, a secured creditor who subjects his claim to the bankruptcy court for determination arguably can be said to have submitted its collateral to the court's jurisdiction as well. Finally, it is clear that in order to have a debt declared non-dischargeable, a creditor must necessarily establish its amount.

■ What then is the effect of seeking a determination of dischargeability, and thereby having to prove the debt, upon a secured creditor's alternatives listed above? Under § 17(a)(3) of the Act, a creditor who applies for a determination of dischargeability does not submit himself to the jurisdiction of the court for any other purpose. Therefore, it is proper to conclude that the proof of a claim for purposes of dischargeability is not the same as a proof for purposes of allowance. Indeed, NSF could properly argue that its claim, whether secured or unsecured, is non-dischargeable and is therefore unaffected by the bankruptcy proceeding. A finding in its favor on that claim would in no way affect whatever valid lien rights it had upon the bankrupt's property. Therefore, it is the conclusion of this court that a creditor may pursue its rights in property which is not within the jurisdiction of the bankruptcy court independent of its right to assert the non-dischargeability of its debt. The next question for decision, then, is whether the "property" involved here is within the court's jurisdiction.

■ Section 2(a)(7) of the Act (11 U.S.C. § 11) grants to the bankruptcy court exclusive jurisdiction to "cause the estates of bankrupts to be collected, reduced to money, and distributed, and [to] determine controversies in relation thereto . . .". Section 23 of the Act (11 U.S.C. § 46) further

clarifies the nature of the bankruptcy court's jurisdiction:

§ 23. *Jurisdiction of the United States and State Courts*

a. The United States district courts [sitting in bankruptcy] shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings under this Act, between receivers and trustees as such and adverse claimants, concerning the property acquired or claimed by the receivers or trustees, in the same manner and to the same extent as though such proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants.

b. Suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this Act had not been instituted, unless by consent of the defendant, except as provided in sections 60, 67 and 70 of this Act.

*Collier* classifies these jurisdictional questions into two groups: (1) those dealing with matters related to the administration of the bankrupt's estate and the property in the court's possession, and (2) those dealing with suits by a trustee against third persons concerning property not in the possession of the bankruptcy court. See generally, *Collier on Bankruptcy*, vol. 2, ¶ 23.02 at p. 438 (14th ed. 1978). The distinction between the two jurisdictional groups has been variously described as the distinction between summary versus plenary jurisdiction. The bankruptcy court has summary jurisdiction to hear all matters related to proceedings in bankruptcy and all controversies over property in its actual or constructive possession. *Hebert v. Crawford*, 228 U.S. 204, 33 S.Ct. 484, 57 L.Ed. 800 (1913); *Murphy v. John Hofman Co.*, 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327 (1909); *Whitney v. Wenman*, 198 U.S. 539, 25 S.Ct. 778, 49 L.Ed. 1157 (1905). *Collier* summarizes nicely the distinction between the bankruptcy court's summary jurisdiction as outlined in § 23(a) and the plenary jurisdiction required for the types of suits described in § 23(b):

Generally speaking, where the controversy is one concerning property in the actual or constructive possession of the bankruptcy court, that court may adjudicate summarily all rights and claims pertaining thereto. [footnote omitted]. Where the controversy is one involving property in the actual or constructive possession of a third person asserting a bona fide adverse claim, the bankruptcy court has no jurisdiction to determine summarily that person's claim upon petition by the receiver or trustee, unless by that person's consent. [footnote omitted]. *Collier on Bankruptcy*, vol. 2, ¶ 23.04[2] at pp. 453–54 (14th Ed. 1978).

Thus, the court's jurisdiction can be said to depend upon whether the "property" involved here is within the actual or constructive possession of the bankruptcy court. The test of the jurisdiction over NSF's claim to the property, whatever that claim may be, depends not on title to the property but on possession by the bankrupt at the time of the filing of the petition in bankruptcy. *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). Where adjudication ensues after the filing of a Chapter XI petition, the adjudication relates back to the date of the filing of the arrangement petition. *Miller v. Woolley*, 141 F.2d 837 (9th Cir. 1944), cert. den. 323 U.S. 716, 65 S.Ct. 44, 89 L.Ed. 576 (1944); *Wood v. Scott*, 180 F.2d 252 (6th Cir. 1950). Therefore, the question becomes whether the bankrupt may be deemed to have been in possession of the right to receive retired pay as of the date of the filing of his Chapter XI petition.

■■■ The status of retired military personnel and their right to receive retired pay is entirely created and controlled by federal statute. *Abbott v. United States*, 287 F.2d 573, 152 Ct.Cl. 798 (1961), cert. den. 368 U.S. 915, 82 S.Ct. 192, 7 L.Ed.2d 130 (1961). There is no vested or contractual right to military retirement, but rather it is dependent upon statute. *Goodley v. United States*, 441 F.2d 1175, 194 Ct.Cl. 829 (1971). Armed service "pay" is defined as including "retired pay". 37 U.S.C. § 101(21). An officer's retired pay has been held not to be

a gratuity, a pension, or deferred compensation for past services, but is pay for continuing military service. *Costello v. United States*, 587 F.2d 424 (9th Cir. 1978); *Hostinsky v. United States*, 292 F.2d 508, 154 Ct.Cl. 443 (1961). In *Hostinsky*, the Court of Claims held that a retired officer is nevertheless still an officer, since he is subject to recall to active duty at the will of his superiors and is still subject to military discipline. In *Watson v. Watson*, 424 F.Supp. 866 (E.D.N.C.1976), the nature of the right to receive military retired pay was further clarified:

The [officer] earns his retirement pay, like his pay when he was on active duty, by staying alive, obeying military discipline, and being subject to recall to the active military service. *Watson*, supra at 868.

The district court in *Watson* went on to note the singular aspect of retired pay that distinguishes it from a pension fund or annuity.

Retirement pay does not become vested in the retired individual except on a daily basis. Until and unless he lives from day to day, no right to retirement pay arises. *Watson*, supra at 869.

Thus, it can be seen that on the date that he filed his Chapter XI petition the bankrupt had no vested right to receive retired pay in the future. He possessed nothing but the right to continue to earn retired pay, which could be extinguished by his death, his recall to active duty, or his loss of officer's rank through court-martial. But he did not have a claim for future wages on the date he filed for relief. Unlike an interest in a pension fund or an annuity, he was not possessed of a present interest in identifiable property.

■■■ This conclusion is buttressed by decisions interpreting § 70(a)(5) of the Act (11 U.S.C. § 110) which deals with title to property. The general rule is that a trustee takes title to all wages, fees and commissions earned or accrued prior to the bankruptcy, or that relate to services already performed, even though they may be paid

subsequent to the filing date, but that no right or title attaches to wages that are to be earned in the future, or that accrue because of services performed after bankruptcy has ensued. *Equitable Life Assurance Society of the United States v. Stewart*, 12 F.Supp. 186 (W.D.S.C.1935); *Miller v. Woolley*, 141 F.2d 837 (9th Cir. 1944). This principle applies equally as well to Chapter XI petitions and operates generally to deny the bankruptcy court any jurisdiction over post-petition wages earned by a Chapter XI debtor. *Miller v. Woolley, Wood v. Scott,* supra.

Turning now to the question posited earlier, this court has jurisdiction of NSF's claim against the bankrupt's retired pay to the extent that the court had actual or constructive possession of that retired pay on the date of the filing of the Chapter XI petition. As we have seen, military retired pay is, in form, the payment of current wages for current military service. As such, the jurisdictional rules as to the bankruptcy court's power over a bankrupt's wages apply. Therefore, the court concludes that to the extent the bankrupt earned or will earn retired pay after the filing of his Chapter XI petition there is no jurisdiction to adjudicate a creditor's rights in such property. Rather, NSF's remedy lies in another court of competent jurisdiction. However, the bankrupt did receive payments from the Army for service rendered up to and including the date of the filing of the Chapter XI petition, which could be considered to have been in the possession of the bankruptcy court as of the filing date.

Normally, most creditors' security, if this property be called that, is not so divisible as to be partly within and partly without this court's jurisdiction. However, the problem resolves itself by examining the essential aspect of this case, and that is that NSF claims that the bankrupt had no rights in his retired pay by virtue of his assignment of it. If that be true, NSF's claim for amounts paid to the bankrupt for military service up to and including the filing date could be characterized as an attempt to reclaim its own property. Even if the bankrupt's position be adopted, NSF could be characterized as seeking reclamation of pledged property wrongfully taken from it. However, because of the liquidity of cash, and the lack of an existing and identifiable cash account to which the court may look for return of the property, the amounts so claimed by NSF, whatever the nature of their rights in the property, are better described as an involuntary unsecured loan to the bankrupts. In effect, NSF claims that the bankrupts wrongfully diverted to their own use funds to which NSF had a right. If NSF can establish that claim, by whatever means, it is a claim separate and apart from the primary claim to the bankrupt's retired pay. In other words, the claim arises not as a result of any assignment, but rather as a result of the alleged misappropriation of funds by the bankrupts in which NSF claims an interest. The point of this discussion is that if NSF chooses to seek recovery of amounts received by the bankrupts for military service up to and including the filing date, it may do so by filing proof of a general unsecured claim, without submitting its alleged "secured claim" to the jurisdiction of the court. That is to say, any general unsecured claim of the kind described above would not be based upon the original loan transaction between NSF and the bankrupts, but arose solely as a result of conduct of the bankrupts which, in effect, forced NSF to make a second, involuntary loan to the bankrupts. To the extent such a claim could be proved, it would not and should not subject NSF to the court's jurisdiction as to the separate claim which arose out of the prior voluntary loan agreement. NSF may prove the former without being required to prove the latter.

## SUMMARY

The bankruptcy court has original and exclusive jurisdiction to determine the dischargeability of a bankrupts' debts. However, that jurisdiction does not automatically extend to property rights created as a part of the debt transaction where the property involved is not within the actual or

constructive possession of the bankruptcy court on the date of the filing of the petition.

In this case, the right to receive military retired pay for services to be rendered after the filing date, because it is in the nature of wages, is not property in the actual or constructive possession of the bankruptcy court and is therefore beyond its jurisdiction. As such, a creditor who seeks to have its debt excepted from a discharge in bankruptcy may nevertheless pursue whatever rights it claims it has in the retired officer's retirement pay, independent of the bankruptcy proceedings.

Furthermore, to the extent that a bankrupt, prior to bankruptcy, intentionally divests a creditor of property claimed by it, thereby subjecting the property to the jurisdiction of the court, the creditor may assert its reclamation rights in the bankruptcy court for that limited purpose, without subjecting itself generally to the court's jurisdiction. And where that property is cash and incapable of being "reclaimed", the creditor may file a proof of a general unsecured claim without affecting its rights in other like property which is otherwise not subject to the court's jurisdiction.

Finally, the trial of NSF's non-dischargeability complaint scheduled for December 18, 1981 at Pittsfield, Massachusetts has been continued until January 29, 1982 at 11:30 A.M. As to all other matters discussed in this opinion, the court shall await appropriate action by the parties. SO ORDERED.